23-1311, Southern Iowa, United States v. John Broomfield, Jr. Mr. Kuehl, when you're prepared, please proceed. Excuse me? Did you want me to be seated or up? Oh, please come to the podium. I'm ready if the court's ready. Please proceed. Thank you. May it please the court, justices, opposing counsel, my name is Joseph Kuehl and I represent the appellant John Broomfield, Jr. in this matter. Terry v. Ohio tells us that an investigatory stop is permissible under the Fourth Amendment if it entails a brief detention that is based on reasonable suspicion that the detained individual has committed or is about to commit a crime. In those last nine or ten words, very simply is my argument that officers Benson and Archibald that reported to the scene on December 19, 2021, had no reason to think that my client, Mr. Broomfield, had committed a crime. They stated as such in their testimony at the suppression hearing that when we arrived on the scene, we didn't think Mr. Broomfield had necessarily done anything wrong. We didn't have any reason to believe it. What information did they acquire once arriving? Well, I believe both of them, although I will be real honest with you, it might have been just one of the officers, but the information they had when arriving on the scene was from the 911 calls. There were two of them. Both of them admittedly gave a very good description of my client. I can't get around that. So why isn't that enough for reasonable suspicion? Well, it's because my main point here, they didn't say he did anything wrong. And I hope I'm not painting myself into too much of a corner by saying this, but had the 911 caller said, I saw Mr. Broomfield punch my friend who's laying on the ground right now, I don't think I'm here. I don't think I can be here. I don't think I have any argument. I think the fact that the 911 callers, once again, give a good description of the appellant, but at best say he's yelling. We don't know what he's yelling. We don't know who he's yelling at. We don't know how loudly he's yelling. One of the callers, I believe it was caller number two, just said he's yelling in the area of the man who's down. Additionally, caller number two, who offers that same testimony, says, I don't know. I don't know if he did anything. It might have been one of his friends who did something. Did the officers talk to someone at the scene? They did. I believe it was Officer Benson who said he talked to one person. And I think this is kind of an important side point. Officer Archibald says that he doesn't talk to anybody. Officer Benson says, I talked to one person when I arrived on the scene. The second 911 caller, I believe, says, I'm talking to an officer right now. We know that Officers Benson and Archibald were the only two on the scene. And so just logically thinking with you, Officer Benson, even though he testified he didn't know who he spoke to, it's just logical that he was probably speaking to the first 911 caller. They gave him the same description, right? Yes, sir. Yes, sir. I believe so. Here is where I think. And also, didn't they also include the detail that this individual was seen yelling near the victim? Yes, sir. The 911 caller said that. I don't know if he said that directly to Officer Benson, but I certainly know that he said that on the 911 tape. Yes, sir. Counsel, I can only speak for myself, but if I were you, I'd use my time to address the four-point base level enhancement. I'm very interested in that claim. Yes, sir. I will do that. That's where I will pivot to. The statute that the government used in order to enhance my client's sentence for the possession of a firearm while on the commission of a different felony was interference with official acts. Right. So my question is, at what point was Broomfield resisting or obstructing for purposes of Iowa law? The exact point is very important to this case. My position is the exact point is when Officer Benson, I believe, grabs him at the back of the bar. Because if you watch the body-worn camera, and I will grant you, someone who watches the body-worn camera might think that my client, the appellant, saw the officers and decided to go the other way. I grant you, somebody could absolutely watch that and come to that conclusion. But as you watch the body-worn- So you're acknowledging that he was resisting prior to the time he fled? Well, no, sir. If I'm giving you that impression, I don't mean to give you that impression. I thought you said when he grabbed his hood. Yeah, but Officer Benson grabbed his hood at the back of the bar. So when the appellant first makes contacts with the officers, they're in the front of the bar by the very front door. Right, right. It's my understanding that under Iowa law, simply walking away from the officer would not violate the statute. But at some point, perhaps, there was resistance or obstruction. And that's what I'm trying to pinpoint. Because the gun didn't fall out until he was stopped, and then he immediately ran away from the gun out the back door. But if he was resisting while he still possessed the firearm, that's an important fact. My position is that he's not resisting before he is dispossessed of the firearm. That the dispossession of the firearm and any resisting that my client does is simultaneously, essentially, at the back of the bar. That when my client turns to walk away from the officers, he's walking away from the officers. Despite their testimony that they were commanding my client to stop as they walked through the bar, that's just not supported by exhibit either two or three of the body-worn camera. It's silence as they're walking back through the bar. So the appellant is not resisting until he gets to the back of the bar and is dispossessed of the gun. I wasn't planning on spending that much time on that argument. I also don't want to gloss over it if the court thinks that is important. Are there any more questions on that specific topic? Let me come back to the suppression argument. Yes, sir. Don't you think the fact, I think as you acknowledge, that when he saw the officers he turned and sort of said, I'm out of here, don't you think that adds to reasonable suspicion? I think it can. Yes, sir. I think it can. Here's kind of my argument with respect to that. If you watch the body-worn camera, there's a big picture window in front of the bar. Both officers testified that the appellant probably saw them as they're approaching the bar. And that's reasonable. There's a huge scene right outside. There are lights flashing. You can see it in the body-worn camera. Clearly there are officers. There's an ambulance out there. If my client's intention was to run, he had a couple minutes to do that. He sees the officers. He knows they're there. He had the opportunity to do that. So once again, while I grant you that a viewer could watch that and think that that's the conclusion they come to, I just think if you look at the surrounding facts, that that's not necessarily the case. I think I made the point in my brief that maybe he forgot that he was parked out the back instead of the front. A little tongue-in-cheek, but we just don't know. I mean, that's my point, is we don't have the evidence to say that that is the case. The last point I want to make about the suppression in conclusion is simply this, that I'm certainly not an encyclopedia of case law. That's just not who I am. That may never be who I am as an attorney. But any case, I do try to be prepared for my clients. But any case I've ever read or the government has ever cited starts with an accusation of criminal conduct. I saw the person with a gun. They tried to run me off the road. They were weaving all over the road. Every case I've ever read starts with that accusation, some sort of accusation. That's what makes this case different. But don't you at least have the implication of an assault that might have occurred? You've got a victim down. You've got somebody over near him yelling. I mean, isn't there at least the inference that an assault has occurred? Once again, not wanting to paint myself into too much of a corner here, but yes, that's absolutely true. And I think one of the hardest questions I have to answer is what are the officers supposed to do? And they certainly have the right to be there. I think they certainly have the right to try to talk to Mr. Broomfield. They have his description. I have no problem with him trying to do that. It's at the point that they grab him that I have a problem because, yeah, there's the accusation he's yelling. But legally, my position is he's in the same position as the 20 or 30 people that are standing around the man that's down. But they presumably were in the area of the assault. An assault certainly happened. Once the officers directed him to stop? Say that again. Did the officers ever direct him to stop when he would begin to leave the bar? No, sir. Despite their testimony that they did, if you watch the body-worn camera, you can see the whole thing. They walk through the bar, and there's never – nobody ever says stop. You need to talk to me. You have to talk to me. There are some comments like, hey, bud, or we'd like to talk to you. There are some kind of informal conduct, a little bit of informal conversation between the parties. But never at any point does any officer say stop, sir, I need to talk to you right now. And it's your position that the absence of that directive is what enables his walk away and stopping him physically was volatile of his rights. Is that your position? Yes, sir. Yes, sir. Thank you. Excuse me. I see that I'm out of time. But if the Court doesn't have any more questions, then I will sit down. Thank you. Thank you, Mr. Kuehl. The Court appreciates your candor and the arguments you've provided. Ms. Sedman. Good morning. May it please the Court. Chief Judge Smith. Chief Judge Grunder. Excuse me, Judge Grunder. Judge Grass. My name is Shelly Seidman and I represent the United States for the Southern District of Iowa. I just want to start kind of where the questions that you were asking Mr. Kuehl led off. And that is, what were the officers supposed to do with the information that they had? There were 911 calls that did come in. Now, the officers don't review the 911 calls, and that's one of the things that was mentioned. The officers don't have access to the 911 calls when they're being dispatched to a location. They received information from 911 that there was a disturbance at the Black Scroll Bar, an area in Council Bluffs where there were several bars. And they showed up at the early morning hours. The officers respond within a minute to four minutes of the 911 dispatch. And those jail calls that came in, although the officers didn't know them, as far as some of the arguments that were made by Mr. Broomfield as to the anonymity of it, is that it's obvious from the calls that they are at that location based on the information that you can hear in the background. But also, some of the things that are said like, hey, can you get someone here soon? There's still a confrontation going on. This man is bleeding. This man is still yelling at the person on the ground. Those are the kinds of things that come into the 911 call. And then also their names and phone numbers were provided. But the second caller provided a very detailed description of the person and the location. Once Officer Benson got there, he went to try and talk to the person that was injured, who was unable to have a conversation and needed immediate medical attention. And so then he talked to one of the bystanders. And in the motion to suppress, Officer Benson said, who is responsible to this bystander? And the bystander said, gave a description of black coat, north face coat, jeans, saints hat, tall black man. When he made that description, he said he went into the black school bar. And when that second 911 call came in, just to back up a second, that 911 caller stayed on the phone until the officers got there. And was asking that bystander, where is the person? Did you see him leave? And so those 911 calls were helpful in just showing the short amount of time between when this assault or disturbance was still occurring to where the location of the person that the 911 caller identified the suspect as. Then that bystander gave the exact same description and location, which is about 15 yards from where the person was lying on the ground. They walked up, the two officers talked to each other, got the description, walked up to the bar. The two of them were conversing, which they were saying, I'm sure he probably already ran out the back door because that bar has a front and back entrance. But we'll check anyways. They walk up and the person is standing at the front of the bar. They can see in through the glass that there's this person, the only person there. As the officer said, that matched the description exactly. Counsel, I'm sorry to interrupt, but I'd really like to turn to the other issue before time expires. Yes, yes. Which is the enhancement for use of a firearm in connection with another felony. Yes. So I'd like you to tell me at what point Broomfield was either restricting or obstructing for purposes of Iowa law. Yes, Your Honor. When they were at the front of that bar, all the other people walked out and Broomfield was the next person to walk out that bar. One of the officers was holding the door and the other one was on the other side of the door. And one of the officers said, come on boss. And the other officer said, come on, and was like, made a gesture. I've seen the video over and over and over. At what point was he resisting? So at that point, he turns and starts walking the other direction. The officer made another comment. And then the government would say that Mr. Broomfield ceased when he put, when Officer Benson grabbed him by the arm. It's my understanding that under Iowa law resisting an officer doesn't occur until it's necessary to use force. At what point was it necessary to use force? Well, the location of where Mr. Broomfield was, was a few more steps. And as you see in the video, you can see just a few more steps until he's out the back door. That is the only person that was described as a suspect. And they did want to talk to him. That was the whole goal. But once they put hands on him to try and get him to turn around, then he was, he turned around and he was yelling at the officers. And the officer was like, stop, stop, stop. And then the gun fell out. So once they turn him around, trying to calm him down so that they can talk to him about this, and that's what the officer said the whole time, is when he was turning and the gun falls out. And then he, the coat comes off and he runs out the back door. So from the point that he turns and walks away from the officers, it's the government's opinion that he knew that the officers were there to talk to him. And he tried to get away. But all knowing well, he had a firearm on him. Once that officer stopped him and turned around, again, he still knew during that interaction he had a firearm on him and then the firearm fell. Now when the firearm falls, that creates a whole more serious situation for everyone involved, the officers, the patrons, Mr. Brookfield himself. At that point, he has to be in constructive possession of the firearm. I'm not sure he was. So I'm more interested in whether he was resisting while he still had the firearm on his body. Yes, the government's position is yes, because once they stop him and he starts yelling at the officers, and they're like, stop, stop, stop, and he kind of is moving, the gun falls out. So all during that confrontation in that back of the bar, he has the gun before it falls out. And during that time, it was necessary to use force. I believe it's the Iowa definition. They tried just to seize him. Its interference with an official act would be any lawful act of the officer. And then the firearm, carrying a firearm is what makes it a felony. One thing that the district court mentioned, I believe, was something to do with trying to get out of his jacket. Could you tell me what the record shows about that? In the video, he does, once the gun falls and then the officer tries to grab him, and his jacket comes off and he goes out the door. So he kind of shimmies the jacket off, and the jacket comes off in the struggle and goes out the back door. And then the officers follow him and are able to take him into custody. So that whole interaction from that moment is the interference with the official act. The officers had a lawful ability to ask questions about this assault or disturbance that had just happened moments before. And then once he has the gun, even if it falls, the gun is still in possession constructively, because he could pick it up, but instead he chose to run out the back door. Part of the reason I'm asking these questions is that all of the sequence of events that you described take place in about two seconds. The whole incident takes place in two minutes, so the government does understand that. And it is very brief, but in looking at the circumstances, it's the government's opinion that Mr. Broomfield does resist the officers at that moment, and then the gun falls out, and then he is apprehended after the officers are able to find him. But the firearm just must facilitate or have the potential to do so. And Mr. Broomfield had that firearm on him from the moment he saw the police officers all the way back until the firearm falls out of his pocket, and then he's arrested after they are able to stop him. So it's like one continuing event. Now you're extending the time back to the time the officers saw him, and that's not consistent with Iowa law. It has to be from the moment that force was necessary and he was resisting. What I meant was, and I apologize if I gave that impression, was just the fact that Mr. Broomfield knew that he was in the possession of that firearm from the moment he saw the officers and then his actions thereafter. That was my intent. Your Honor. So it's the possession that, during that time, that firearm was in his possession on his body and available for use or for whatever purpose that Mr. Broomfield had. If no one has any additional questions, I'm about out of time, but the government would ask the court to affirm the decision of the district court and find that there was no error. Thank you. Thank you, Ms. Sidman. I apologize for mispronouncing your name initially. It's correct. Thank you. Mr. Kuehl, I believe you used up your rebuttal during opening. We've engaged you fairly thoroughly. Is there any final thoughts you had in response to the government's position? No, Your Honor, but thank you for asking. All right. Thank you, counsel. You may be excused.